(Decided 26th March, 1884.)

ANNE MARIA ESCHBACH *vs.* ELIZABETH H. COLLINS and RICHARD BERNARD, Administrators, &c., and others.   JOHN BURKE and PATRICK REDDINGTON *vs.* SAME.   A. LEO KNOTT, Executor of JOSEPH A. ESCHBACH *vs.* SAME.

*Will—Obliteration—Alteration—Authentication.*

A testator cannot by the obliteration of certain words in his will, convert a life estate into a fee simple.

A testator left ten children—seven sons and three daughters.   By his will he directed that his estate be divided into ten equal parts or shares, and he gave to all his children life estates in their respective shares, with remainders over to their children, except his sons J. E. and L., to whom he gave their respective shares absolutely and in fee.   Some time after the execution of the will, the testator erased or obliterated the names of his sons J. E. and L., wherever they occurred by drawing a line through them with his pen, but leaving the names legible.   The erasures operated to confer estates in fee simple on all the sons.   HELD :

That the attempted obliterations were inoperative, and the will should be read as it was originally written and executed.

Eschbach, *et al. vs.* Collins and Bernard, *et al.*

Any alteration in a will by interlineation or obliteration, whereby a different disposition of the estate is sought to be made, will be held void, and the will will operate as originally executed.

Every alteration in a testamentary disposition of real estate, must be authenticated in the manner prescribed by the statute.

APPEALS from the Circuit Court of Baltimore City.

The bill of complaint in this case was filed by Elizabeth H. Collins, and Richard Bernard, administrators with the will annexed, and trustees under the will of John Eschbach, late of Baltimore City, deceased, for the purpose of obtaining a judicial construction of said will. The will contained the following provisions:

First. *I hereby appoint my sons, Leo Eschbach and John E. Eschbach, executors of this my last will and testament,* and direct them to pay my just debts and funeral expenses, giving them power, as executors, to sell to such extent as may be necessary to make such payment, such parts of my estate, real or personal, as may be necessary, and the like power to any administrator of my estate.

Second. I give, devise and bequeath all the rest and residue of my estate, of every kind and description, which I may leave at the time of my death, to my said sons *Leo Eschbach and John E. Eschbach,* and their successors in the trust hereby reposed in them; it being my will that there shall at all times be at least two trustees, and that one alone shall not be competent to act, and that in case of death, refusal to act, inability from any cause, or resignation, that a successor or successors shall be appointed by some Court having jurisdiction of trusts, and that no person shall act as trustee unless he first give bond to the State of Maryland, in such penalty, and with such security as shall be determined by some Court having jurisdiction over trust estates, in trust to, and for the following uses and purposes:

That the amounts which I have advanced or may advance up to the time of my death, to any of my sons or daughters,

or to any son-in-law, evidenced by notes or otherwise, shall be ascertained by the said trustees, or their successors, as speedily, after settling in the Orphans' Court, as possible, and that the entire amount thereof shall be added to the rest and residue of my estate, bequeathed as aforesaid, and the aggregate amount thereof shall be divided into ten equal parts, the number of my present living children, by three disinterested persons to be appointed by some Court having jurisdiction over trust estates, the decision of a majority of whom to be final, and such appointments to be continued until a division shall have been had; each of my sons to have one share, and to be charged with advances made or to be made to him, and each daughter to have one share, and to be charged with advances made or to be made to her. or her husband, and the portion of each son and daughter in the said rest and residue to be reduced to the extent of such advance made or to be made as aforesaid; the division to be so made as aforesaid to be reduced to writing, and to show the share or portion of each, and each piece of property to be separately valued; the said division to be acknowledged before a Justice of the Peace by the parties making the same as their act and deed, and to be recorded in the Court having jurisdiction of trusts making the said appointments, and also recorded among the land records of Baltimore City; the share of my sons *Leo* and *John E. Eschbach* to be held by each of them who may survive me, absolutely, and the trust hereby created to cease as respects them or the one who may survive me. The shares of my other children to be held for their respective lives, my daughters' shares to be for their and each of their sole and separate use, freed from the control of any husband and in no way liable for his debts. In case any of my said children, exclusive of *Leo* and *John E. Eschbach*, should die, leaving a child or descendant, then such share shall pass to such child, children, descendant or descendants *per stirpes* and not *per capita;*

but, in case of the death of any such child leaving no child or descendant at the time of such death, then the part or share of the one so dying shall pass to my surviving children and descendants of any deceased child per stirpes absolutely and forever. * * * * In case any of my ten children, now living, should die before me, leaving no child or descendant living at the time of my death, then my said estate shall be so divided as to reduce the number of shares, and to make the number equal to the number of my children who may survive me, and of such of my children as may have died before me, leaving a child or descendant surviving me, it being my will that in the case now supposed the descendant of a deceased child shall take the share of the parent, it being also my intention to pass life estates to all my children and descendants of a deceased child, who may take at the time of my death, with the exception that my sons *Leo Eschbach* and *John E. Eschbach* shall each, if he survives me, take absolute fee simple estates in their respective shares."

When the will was found after the death of the testator, the words in *italics* in the foregoing extracts, had been marked over with pen strokes, as if for the purpose of erasure, but were still legible. The testator left no widow, but he left ten children—seven sons and three daughters—who together with their wives and husbands, and their children and their wives and husbands, as also several judgment creditors of some of said children, were made parties defendant. Joseph A. Eschbach, a son of the testator, died without issue, after the filing of the bill. He devised all his property to his wife Anne Maria Eschbach, and appointed A. Leo Knott his executor. Answers were filed to the bill, and testimony was taken. The Court (DOBBIN, J.,) adjudged, and decreed, that the true construction of the will of said John Eschbach as it stood affected by the erasures, which it was shown by the evidence, that he made therein, was, that Leo Eschbach and

John E. Eschbach, sons of said testator, were to be omitted, as executors and trustees under said will, and that the complainants were, under the order of 27th September, 1881, appointing them trustees under said will, in place of said Leo Eschbach and John E. Eschbach, to hold the estate of said testator, for the trust purposes mentioned in said will, as affected by said erasures, that is to say, for the use of all the children of said John Eschbach, for, and during the term of their respective lives, the shares of the daughters, to be for their sole and separate use, freed from the control of any husband, and in no way liable for his debts; and in case any of the said children of said testator die, leaving a child or descendant, then such share should pass to such child, children, or descendant or descendants *per stirpes* and not *per capita;* but in case of the death of any child leaving no child or descendant at the time of such death, then the part or share of the one so dying, should pass to the testator's surviving children, and descendants of any deceased child *per stirpes,* absolutely, and forever freed from any further trust. And it appearing by the testimony, that Joseph A. Eschbach, one of the sons of the testator, had died since the death of the testator, leaving no child or descendant living at his death, and leaving a last will and testament, under which, A. Leo Knott was executor—as to his share, it was ordered, that an account be taken of rents, dividends and income received up to the day of the death of said Joseph, and the same, or so much as had not been paid to said Joseph, or his said executor, be paid over to said executor, and that as to the principal of the share of said Joseph, it was divisible among all the other children of said testator now surviving, absolutely, in equal shares, and freed from all trust, as soon as the share of said Joseph could be separated from the rest of the estate. And proper accounts should be stated as to all the children of the testator, other than said Joseph, of the rents, profits, dividends and incomes

of their respective shares. And the complainants were instructed to state their accounts before the master and auditor Mr. Thomas, in accordance with the opinion accompanying this decree. And the said auditor and master was directed to take an account of all advances made by the testator, as mentioned in his will; and leave was reserved to all parties interested, to suggest to the Court the names of three disinterested persons, to be appointed by the Court, to make a division of the estate of the testator, in pursuance of the directions of his will, and according to the rights of the parties, as declared in this decree.

From this decree three appeals were taken: one by the widow of Joseph A. Eschbach, one by the executor of the said Joseph, and the third by judgment creditors of John E. Eschbach, a son of the testator John Eschbach.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, and BRYAN, J.

*A. Leo Knott,* for Anne Maria Eschbach, and the Executor of Joseph A. Eschbach.

The cancellations and obliterations found on the will, are valid and effective without a re-execution or republication of the will; the 6th section of the Statute of Frauds— found in section 5 of Article 49 of the Revised Code of Maryland—does not require that a revocation, effected by obliteration or cancellation made in a will, shall be evidenced by witnesses, and that the will thus obliterated shall be republished. That section points out and enumerates the various methods by which a devise of lands may be revoked, but it nowhere requires revocation by obliteration merely, as in this will, to be executed in the presence of witnesses.

To hold so, is to deprive the words " burning, cancelling, tearing, obliterating the same by the testator, etc.," as

methods of revocation of all meaning and efficacy and to interpolate into the section words and conditions which are not found there. Such construction moreover would entail this extreme conclusion, which would certainly be a *reductio ad absurdum,* namely, that a will once made could never be revoked except in the presence of witnesses, which is wholly untenable. This proposition applies either to the whole or to any clause of the will, to a devise or any clause of a devise of lands contained in the will, for the section says expressly, "*no devise in writing of lands, tenements or hereditaments, or any clause thereof*" shall be revocable, etc. The methods of revocation reserved and excepted out of the sixth section of the Statute of Frauds—section 5, Article 49, of the Revised Code—were methods of revocation known to the common law before that Statute, and stand upon the same footing now in virtue of such exception and reservation, as if that Statute had never been passed. 1 *Jarman on Wills,* 291; 1 *Redfield on Wills,* 308, 315, 317; *Swinton vs. Bailey,* 48 *Law Journal Reports, Ex. Div.,* 57, (see the reasoning of Lord Penzance, page 61); *Larkins vs. Larkins,* 3 *Bos. & Pull.,* 18; *Sutton vs. Sutton, Cowper,* 432; *Short vs. Smith,* 4 *East,* 419; *Burkitt vs. Burkitt,* 2 *Vern.,* 498; *McPherson vs. Clark,* 3 *Bradford Surrogate Repts.,* 92; *Martins vs. Gardner,* 8 *Sim.,* 73; *Utterson vs. Utterson,* 3 *Ves. & Bea.,* 122.

And this construction of the sixth section of the Statute of Frauds derives conclusive force and strength from the consideration of the fact, that the Statute of 1 Vict. chap. 26, which was passed to alter and modify the law relating to the revocation of wills, expressly provided in the 21st section that an obliteration, to be valid, should be signed and attested. This shows what the state of the law, and the opinion of Westminster Hall was on the subject of revocation by obliteration, before the passage of 1 Vict. Had it been as contended for by the other side, there had

been no occasion or necessity for this 21st section of the
Statute of 1 Vict.

The will having been originally executed according to
law, that legal execution attached to each and every part
of it, to each and every clause in it.   The unobliterated
parts of the will, if sensible and otherwise effective, con-
stitute the will of the testator, and must be carried out
according to their natural, proper and legal construction.
*Kirkpatrick's Appeal*, 22 *N. J. Eq. Repts.*, (7 *E. C. Green*,
464); *Bigelow vs. Gillott*, 123 *Mass.*, 105; *Clark vs.
Smith*, 34 *Barb.*, 140; *Humphreys vs. Taylor*, 5 *Bacon's
Abridgment, Title Wills*, 535; *Brown's Will*, 1 *B. Mon.*,
57.

If under such construction the legal effect and opera-
tion brought about by such obliteration and cancellation,
are to change the direction or disposition of the property of
the testator, or to enlarge or diminish the estate of any of
the beneficiaries, that change is as valid under the Statute
as if such change in the direction or disposition of the
property of the testator, or any part of it, had been made
by codicil or a new will, executed in the presence of wit-
nesses.   To say that a testator can revoke by obliteration
merely, provided he makes thereby no change or alteration
in the disposition of his property, would make the oblitera-
tion idle and absurd.   For there can be no revocation by
obliteration unattended by some change or alteration in
the disposition of the estate of the testator, or parts of it.
In the nature of things the estate of the residuary devisee,
or some other of the devisees, is enlarged or augmented
by such revocation, either in quality or quantity, and such
devisee takes this enlargement or augmentation of estate
made by such revocation, under and by virtue of the un-
obliterated parts of the will, which remain and constitute
the valid and effective last will and testament of the tes-
tator.   *Humphreys vs. Taylor*, 5 *Bacon's Abridgment,
Title Wills*, 535; *Bigelow vs. Gillott*, 123 *Mass.*, 105–107.

Eschbach, *et al. vs.* Collins and Bernard, *et al.*

The will of John Eschbach originally made two of his sons, John E. and Leo, executors and trustees; and while giving but life estates to all his other children, he excepted these two and gave them fee simple estates in their respective shares.  Afterwards he changed this state of things.  He not only removed John E. and Leo, as executors and trustees, but went on and struck out the provisions by which they in other parts and clauses of the will were to have exclusively a fee simple interest, and enlarged the estates of his other sons to a fee simple in their respective shares, thus making all the sons the equal sharers of his bounty.  These clauses, read as they now stand in the will, unquestionably give to all the sons of the testator a fee simple in their respective shares.  The will is to be read as if the obliterated words were never in the will; and so read, it follows according to the natural, ordinary and grammatical construction of these clauses, that fee simple estates are conferred on the sons.

In *Swinton vs. Bailey,* 48 *L. J., R. H. L.;* Lord CAIRNS seemed to hold : That the validity and legal effectiveness of the obliteration depended upon the result, holding that where it diminished the estate, the revocation by obliteration was merely valid, but where the result was to enlarge the estate, it required a republication of the will.   For this no authority is given, and the distinction is not supported by any reasoning.   Lord Penzance combats this view very successfully.   The whole question turns upon the construction of the sixth section of the Statute of Frauds (*Revised Code, Art.* 49, *sec.* 5.)   The obliteration is valid *per se,* or it is not under the Statute.   Its validity being thus determined, it cannot be impaired by the effect and consequence thereof, on the estate given or resulting therefrom, or whether the estate be thereby enlarged or diminished.

In the will of the testator in this case there are no new words introduced or interpolated ; there is no new gift to

Eschbach, *et al. vs.* Collins and Bernard, *et al.*

·any one ; there is no alteration arising from a new gift or devise. The alteration in this case arises merely from a revocation by obliterations, which can be made without ·attestation or a re-execution of the will. This distinction between an alteration arising from a new gift or new ·devise in new words, and an alteration arising from a mere revocation by obliteration was made by Lord ALVANLEY, in *Larkins vs. Larkins,* 3 *Bos. & P.,* 16, and has been recognized and followed by all the authorities ·since, and is indeed the plain and unavoidable prescription of the sixth section of the Statute of Frauds, and of the ·corresponding fifth section of Article 49 of the Revised Code. See also *Utterson vs. Utterson,* 3 *Ves. & Bea.,* 122.

The obliterations are not a new devise ; they are simply ·the erasing of certain words—they give nothing—the words left in the will, deliberately and carefully left in, the unobliterated parts of the will give the devise, and these words, these parts, were executed with the formali-·ties required by the Code. Obliterations, unaccompanied by interlineations, by new words expressing and declaring new devises, new gifts, are valid without the formalities referred to, attestation and re-execution ; although it may happen as a result, *that by reason of the remaining un-obliterated* parts of the will or of a clause in the will, other devisees in the will, may take another or different ·estate in the land, than they would have taken, had the obliterations not been made. See Lord ALVANLEY's reason-ing in *Larkins vs. Larkins,* 3 *Bos. & Pul.,* 16, and Lord Penzance in *Swinton vs. Baily,* 48 *L. J. Reports,* 54, *House ·of Lords.*

*Bernard Carter,* and *Arthur W. Machen,* for Burke and Reddington, judgment creditors of John E. Eschbach.

It is clear, that, in the face of the Code, the testator could not make any new testamentary disposition of any part of his lands by an unattested codicil, or by changes

made in the text of the will.   It has been held, indeed,
under the similar provisions of the Statute of Frauds, that
the testator might *cancel* a particular devise ; but if the
attempt at cancellation aims at more than this, and seeks
to give to the same or some other devisee something which
the will did not originally give him, then the endeavor
goes for nothing, and the will stands as written.   To hold
otherwise would be to enable the testator, contrary to the
Statute, to make a devise of land which is not attested in
the manner prescribed by law as to all devises.   What is
the case here ?   It is claimed on the part of the appellees,
that the fee simple estate of John E. Eschbach, given by
the will, has been cut down and abridged to a life estate
by means of the supposed cancellations.   But what then
becomes of the estate in remainder—the fee ?   If it is
contended, (as it must be on the other side,) that this,
by the altered will, is devised to the children John E.
Eschbach may leave surviving him, or, in default of issue
of his, to the other children of the testator, a devise is
thus in effect inserted in the will which was not there at
the time it was executed ; the effect of the words remain-
ing after the removal of those which have been expunged,
being to give to individuals other than the devisee whose
gift is immediately affected by the cancellation, new estates
not originally given to them.   This it was not in the power
of the testator to do.   1 *Jarman on Wills,* 134 ; *Larkins
vs. Larkins,* 3 *Bos. & Pul.,* 21, 22, (ALVANLEY, C. J., and
CHAMBRE, J.,) ; *Swinton vs. Bailey,* 1 *Exch. Div.,* 119, 120,
(Lord COCKBURN, C. J.,) ; *Dickinson vs. Stidolph,* 11 *C. B.
N. S.,* 360, 361 ; *Locke vs. James,* 11 *M. & W.,* 908, *per*
ROLFE, B.; *Quinn vs. Quinn,* 1 *Thomp. & Cook,* (*N. Y.,*) 437.

Any other rule would not only disregard the words of
the Statute, but frustrate its plain intent, which is to
throw around every devise of real property certain re-
quired formalities.   It would be quite easy in many cases,
by merely striking out particular words from a will, to.

make it dispose of the property in a manner directly the opposite of that expressed in it originally. Thus, if the words of a devise were, "to my son William I give nothing, and give all my estate to my son John," it could be made, without the insertion of any additional word, to read, "to my son William I give all my estate." Under such a latitude of construction, many opportunities would be given to fraud.

Lord ALVANLEY expressed the true rule, "If the remaining legatees were to acquire any estate which they had not before, something beyond a mere revocation would be necessary." 3 *B. & P.*, 21. In the present case the will contained no devise to the children of John E. and Leo; nor did it contain any devise *in fee* to the *other* sons of the testator; consequently, if the effect of the alterations is, either to make devises to John E. and Leo's children—in substitution, in part, for the estates of inheritance originally given to John E. and Leo; or to convert the original devises of life estates to the *other* sons into devises in fee, then the change involves more than an act of revocation, and is an attempt to accomplish certain new dispositions, which the authorities show cannot be done.

It being manifest that the testator did not mean to create an *intestacy* as to any part of his estate, by means of the obliterations, but only to substitute other dispositions for some of those made in the will, and such intent not being capable of being accomplished, the changes are wholly inoperative, according to a well settled principle. *Dickinson vs. Stidolph*, 11 *C. B. N. S.*, 360; 1 *Jarm. Wills*, 135; 1 *Wms. Exec.*, (*8th Ed.*,) 150, 151; 1 *Redf. on Wills*, 315; *Onions vs. Tyrer*, 2 *Vern.*, 742; 1 *P. Wms.*, 345; 1 *Wms. Saund.*, 280 *c*, *note to Duppa vs. Mayo; Dancer vs. Crabb, L. R.* 3 *Prob. & Div.*, 98; *Jackson vs. Holloway*, 7 *Johns.*, 394.

It is a consequence from these principles that the original devise of a tenth of the estate to John E. Eschbach, in

fee, must be held to stand. For like reasons, the original, devise of a life estate only to Joseph A. Eschbach, could not, by alteration of the will, be enlarged to a fee.

If, however, full effect should be allowed to the obliterations, and the will is read without the words which have been struck out, John E. Eschbach will still be entitled to a fee in one-tenth, by force of the latter part of the concluding paragraph of the will, preceding the *in testimonium* clause, and also of the clause in the third paragraph, beginning, "the share of my sons, &c."

*Richard Bernard*, for the appellees.

The effect of the memorandum is to prove conclusively that the testator made the erasures, and when he made them, nothing more and nothing less. *Kirkpatrick's Will*, 22 *N. J. Equity Reports*, 464.

What was the effect of the erasures or obliterations thus made? Here lies the controversy of this case, and here we are brought face to face with the Statute, 29 Char. II, sections 5 and 6, substantially in force, wherever the English jurisprudence prevails—our Act of 1798, chapter 101, sub-chapter 1, section 4, codified into Article 93, sections 301 and 302. Allowance being made for changes of orthography, our Maryland Statute is a clerical transcript of the English Statute, thus giving an importance to the decisions of other Courts on this subject, not admitted when dealing with purely local Statutes. Section 301 contains the formalities necessary to a good devise of land. Section 302, the methods of revocation and alteration. The distinction between an alteration and a revocation is apparent on the face of the Statute, and, while every revocation is an alteration, that is, there can be no revocation which does not work an alteration, somebody gets something he did not have before, yet, for all practical purposes, the distinction is clear.

One of the modes of revocation pointed out by the Statute is obliteration. It is almost useless to cite authori-

ties in favor of the proposition that a will may, in whole or in part, be revoked by obliteration made by the testator or by his directions "*animo revocandi.*" See *Semmes vs. Semmes,* 7 *H. & J.,* 388.

All the cases assume that the obliteration need not be complete, that the words obliterated may still be legible; the question is only raised in one case, as far as our observation goes, that of *Evans' Appeal,* 58 *Penn. St.,* 238, which decides according to the general assumption indicated.

The will before us is but partially obliterated, the result of which, according to all the authorities, is a partial revocation, or as it is sometimes called, a revocation *pro tanto.* 4 *Kent's Com.,* (12th *Ed.,*) 532 ; 1 *Jarman on Wills,* (5th *Am. Ed.,*) 291; 1 *Redfield on Wills,* 308–315 ; 2 *Green. on Evidence, sec.* 681; 6 *Green's Cruise's Digest, Title* 38, *ch.* 6, *secs.* 38 *to* 42.

All the text-books rely on the case of *Sutton vs. Sutton, Cowper,* 812, a leading case, to show how much a will can be mutilated by obliteration, and yet be operative as to what remains. Other leading cases are *Larkins vs. Larkins,* 3 *Bos. & Pull.,* 16, and *Short vs. Smith,* 4 *East,* 429.

In all these old cases there was no republication of the will.

In *McPherson vs. Clark,* 3 *Bradford Surrogate Reports,* 95, the distinction between a revocation and an alteration is clearly defined.

The intention which actuated the obliteration may be inferred from the state or condition to which the instrument has been reduced by the act, or it may be otherwise proved by the declarations of the testator, especially if the declarations are contemporaneous with the act of cancellation. In the *Goods of John Woodward, L. R.,* 2 *Prob. & Div.,* 206.

What did our testator mean to accomplish ? What was the intention ? This is the polar star in the construction

of wills.   To aid this purpose, words will be left out or
will be changed.   He did not intend to revoke the whole
will and die intestate, that is certain.   Nobody contends
that he intended that Leo and John should have nothing.

It is contended that the effect of the obliterations is to
give all the sons absolute estates.   It is evident from a
reading of the whole will as left, that that was not the
testator's intention ; and if it be evident that such was not
his intention, that alone is the end of that proposition.

There can be no doubt that the intention indicated by
the learned Judge of the Circuit Court was, beyond con-
troversy, the intention of the testator.   This intention is
confirmed by the fourth set of obliterations.   Moreover,
as to the word sons being permitted to remain in three
places where Leo and John are erased, it must be remem-
bered that the words sons were surplusage in the original,
and might be left out; besides, said sons, meaning Leo
and John, remain in the second set of erasures.   More-
over, as observed by the learned Judge of the Circuit
Court, such a construction is unlawful, for where is the
*animus revocandi?*   According to this contention, the result
of the obliterations was to create five absolute estates
instead of five life estates.   There is no authority for such
a construction, even were it the testator's intention, which
it most certainly was not, unless it be a mere *dictum* of
Lord PENZANCE, in *Swinton vs. Bayly,* while every authority
in text-books and reports are against it.

Assuming, then, that the learned Judge of the Circuit
Court is not in error as to the intention of the testator, all
that is left is to inquire whether that intention was law-
fully exercised in this case.   *Swinton vs. Bayly, L. R.,* 1.
*Exch. Div.,* 110, and affirmed by the House of Lords.
See 48 *Law Journal,* 57,   There can be no doubt of the
propriety of reducing, by obliteration, a devise in fee
simple to a life estate.

And if we are asked what became of the parts revoked,
the answer is to be found in *Bigelow vs. Gillott,* 123 *Mass.,*

105, viz., it is disposed of by the residuary clause executed with all the formalities required by the Statute.    See also *Rizer, et al. vs. Perry, et al.*, 58 *Md.*, 112, and authorities therein referred to.

YELLOTT, J., delivered the opinion of the Court.

The bill of complaint in this cause invokes a judicial construction of the will of John Eschbach, the meaning of which having been rendered ambiguous, obscure, and, in some places, apparently incomprehensible by obliterations made by the testator a number of years subsequent to the date of its execution.    The will was originally executed in conformity with the requirements of the statute prescribing the formalities to be observed in making a testamentary disposition of real estate.    In the first clause, two of the testator's sons, Leo Eschbach and John E. Eschbach, are appointed executors, with the usual directions in regard to funeral expenses and the payment of debts.    In the second clause the whole estate, real and personal, is devised and bequeathed to the said Leo and John E. Eschbach in trust.    The testator then proceeds to declare the nature and purposes of the trust thus created, and the mode and manner in which it shall be executed, with a multitude of provisions not necessary to be here recited, as they involve no questions now presented for adjudication.    The *corpus* of the estate is to be divided into ten equal parts corresponding to the number of the testator's children.    Leo Eschbach and John E. Eschbach are, each, to take one-tenth, entirely exempted from the operation of the trust, and to be held by them absolutely, or in fee simple.    To the other sons, and the daughters, life estates are given with remainders as prescribed by the terms of the will.    It becomes important, in the construction of this will, to observe that none of the children of the testator are mentioned by name except Leo and John E. Eschbach.    The others are simply designated as sons or daughters.

After the death of the testator the will was discovered with certain words written below the signatures of the attesting witnesses. This writing is somewhat deficient in perspicuity, which is, perhaps, attributable less to the general imperfection of human language than to the peculiarity of the diction employed. It was not there when the will was executed. It has no attestation, but is supposed to be in the hand-writing of the testator and was signed by him. It is in these words :

February 3, '80.

For Good & *soun* Reason, I arrest John E. Eschbach Name, and Leo Eschbach his Name, the above date, in Good Health and Reason. Signed the above date.

JOHN ESCHBACH.

In each clause of the will, wherever the names of Leo Eschbach and John E. Eschbach occur, a pen has been drawn across, leaving the names legible but the writing partially defaced by the attempted obliterations.

Two important changes in the will result from these erasures. The first is the removal of Leo and John E. Eschbach as executors and trustees. No question here arises for the determination of this Court; the said Leo and John E. having declined to act as executors, and their formal renunciation being embodied in the record. The Circuit Court has also, in the exercise of its jurisdiction, and in conformity with the provisions of the will, appointed trustees, and Leo and John E. Eschbach have admitted and averred in their answer that said trustees have been duly appointed. But another and more material change has been effected by these erasures. The will, as originally executed, gave life estates to all the sons except Leo and John E. Eschbach. The erasure of the two names operates to confer estates in fee simple on all the sons. The testator says, in the second clause, " the shares of my sons Leo and John E. Eschbach to be held

by each of them, who may survive me, absolutely, and the trust hereby created to cease as respects them, or the one who may survive me. The shares of my other children to be held for their respective lives," &c., &c. The testator had other sons besides the two specially mentioned by name. Omit the words erased and it will be seen, at a glance, that all the sons take absolutely, and the words " my other children " apply only to the daughters. Again in the concluding portion of this clause the testator says, " it being also my intention to pass life estates to all my children and descendants of a deceased child, who may take at the time of my death, with the exception that my sons, Leo Eschbach and John E. Eschbach, shall each, if he survives me, take absolute fee simple estates in their respective shares." He has erased the names of Leo Eschbach and John E. Eschbach, and this obliteration manifestly creates a fee simple estate in each son, and renders the word " children " applicable only to the daughters.

The first question presented for adjudication is whether a testator can, by the obliteration of certain words in his will, cause the transmutation of a life estate into a fee simple. This is the converse of the proposition presented by the case of *Swinton vs. Bailey*, 1 *Exch. D.*, 112. There the effect of the obliteration was to diminish an estate in fee simple and convert it into an estate for life. Chief Baron KELLY in the Exchequer held that this could not be done. The judgment of the Exchequer was reversed in the Court of Appeals, COCKBURN, Ch. J., saying: " Although it is a devise in fee simple, I think that is (so far as it is matter of revocation) divisible into two parts, and that the man who has given the larger estate may revoke the gift to that extent, and cut it down to the smaller gift or devise of an estate for life. It may be that you cannot add to the will." The decision of the Court of Appeals was affirmed in *House of Lords*, 48 *L. J.*, 57.

The only principle determined in this case was that an estate might be diminished by the erasure of certain words, and any general observations, made by Judges, which extended beyond the scope of the question in controversy, could hardly be recognized as establishing a safe precedent even within the jurisdiction where the decisions of that Court must be received as authoritative.

In *Larkins, et al. vs. Larkins, et al.,* 3 *Bos. & Pull.,* 20, Lord ALVANLEY, Ch. J., said : "If the remaining devisees were to acquire any estate which *they had not before, something beyond a mere revocation would be necessary.*"

A careful analysis of either of the English or the Maryland Statute would seem to lead irresistibly to the conclusion that every testamentary act by which property is transmitted should be authenticated in the manner prescribed by the Legislature. A man may devise the whole of his estate in fee simple. This is one testamentary act. He may subsequently change his intention, and, as the fee is susceptible of subdivision, he may determine to give a less estate. This would certainly be another and a distinct testamentary disposition, and when it is alleged that he has so determined, the adduction of the proper proof is requisite. It is apparent that this proof must be supplied by the production of another will or a codicil properly attested and executed. Hence, it would seem to have formerly been the settled doctrine in England, that "any alteration that amounts to a new devise of the land, requires that the will should be re-executed according to the Statute." *Lovelass on Wills,* 349.

The American cases fully recognize this doctrine, and when an attempt has been made by interlineation or obliteration to make a different disposition of the estate, the attempt has been held to be abortive, and the will operated as originally executed. In *Jackson vs. Holloway,* 7 *John.,* (*N. Y.,*) 395, a testator having made his will, devising his lands then in possession to his four sons, sub-

sequently acquired other lands which, by the statutes of the State, did not pass by a will executed antecedently to the seisin. He attempted an alteration by erasures and interlineations so as to make the devise extend to all the lands of which he should die seised; and endorsed a memorandum to that effect on the will, stating the alterations which he had made. This memorandum was attested by two witnesses only. It was held that the erasures and interlineations did not destroy the original devise, but that the alterations, not having been attested by three witnesses could not operate. The Court said: "The obliterations in the will were made, not with an intent to destroy the devise already made, but to enlarge it, by extending it to lands subsequently acquired. The testator, however, failed in making interlineations and corrections which could operate, from not having the amendments attested according to law. The obliterations cannot therefore destroy the previous devise, for that was not the testator's intention."

In *McPherson vs. Clark*, 3 *Bradf.*, 99, the testator attempted to revoke the devise to his daughter by striking out the words "my children" and inserting "my two sons." The Court said: "This insertion is inoperative for want of re-execution and attestation; and the intent failing as to the substitution intended, it must fail likewise as to the revocation intended. Enough remains on the face of the will to show that the word erased was 'children,' and the will must be so recorded."

In the case of *Wolf vs. Bollinger*, 62 *Ill.*, 372, the testator having devised his estate to one person afterwards attempted to transfer it to another. The alteration was made by an interlineation which was not attested in the presence of the testator. The Court said that "for want of a compliance with this statutory requirement, the instrument did not operate as a disposing will. The cancellation was not made with intent to revoke the devise to

the complainant, simply, but with intent to substitute in her stead the defendant; and the ultimate object of substitution having failed of accomplishment, the cancelling, which was done only in the view of, and in order to effect that object, should be esteemed for nothing, and be considered as not having been made absolutely, but only conditionally, upon the attempted substitution being made effectual. To give it effect under the circumstances, would seem to be to thwart the intention of the testator, and make him intestate when he manifested a contrary intent by his will."

In the case of *Bigelow vs. Gillott*, 123 *Mass.*, 102, there was an entire obliteration of the sixth and thirteenth clauses of the will by ink lines drawn through and across every word constituting those clauses. This was held to be a revocation of these two clauses; leaving intact the other clauses in the will. The Court said: " He revoked the sixth and thirteenth clauses, and purposely and intelligently left the other provisions to stand as his will." " The argument, that this view is in conflict with the provisions of law which require that a will disposing of property should be executed in the presence of three witnesses, is not sound. It is true that the act of revocation need not be done in the presence of witnesses; but such act does not dispose of the property."

If this was simply a question of revocation its determination would involve a construction of sec. 302, of Art. 93, of the Maryland Code of General Laws, which prescribes the mode by which a revocation may be effected. The language of the statute is, "No devise in writing of lands, tenements, or hereditaments, or any clause thereof, shall be revocable" except in the manner designated. An entire will can thus be revoked, or any clause thereof. What then is a clause? Does it consist of two or three words which, disjoined from the context and transferred to a separate sheet of paper would be devoid of sense or

meaning? Do the mere names of two persons constitute a clause? Is not a clause always understood to mean one of the subdivisions of a written or printed document? Is the word ever used in any other sense? Wills are frequently subdivided into a number of clauses. In one, the testator may provide for the payment of debts; in another, dispose of his personal property; in a third, devise his real estate; in a fourth, leave legacies; and then there may be a residuary clause. Is it not apparent that the statute has reference to one of these subdivisions of a will when the word clause is used in connection with revocation? It is true that a whole will might be revoked, or any clause thereof, by obliterating all the words necessary to give it meaning. To deprive a will of all meaning would be as effectual a revocation as if it had been consumed to ashes.

It is manifest that in the construction of this will a question is encountered which involves something more than mere revocation. The will has not been revoked; it has been altered. It cannot be supposed that when the Legislature uses the word "revocation" it is to be construed to mean mutation. Revocation is certainly not a synonym of alteration. To revoke a testamentary disposition plainly means to annul it; and the revocation of a clause implies the destruction of that clause. In legal contemplation it ceases to exist, and is as inoperative as if it had never been written. It is not necessary that the words erased should be wholly illegible, but the act of the testator must be such as to clearly indicate an intention to expunge the whole clause, so that it shall no longer constitute a subdivision of the will. But when by the obliteration of certain words a different meaning is imparted, there is not a mere revocation. There is something more than the destruction of that which has been antecedently done. There is a transmutation by which a new clause is created. There is another and a

distinct testamentary disposition which must be authenticated by the observance of the statutory requirements. The statute after designating the modes of revocation, whereby that, which has already been done, is rendered inoperative by being destroyed, says in language wholly free from ambiguity, and therefore needing no construction: "or unless the same be altered by some other will or codicil in writing, or other writing, signed in the presence of three or four witnesses declaring the same."

There can therefore be no alteration in a testamentary disposition of real estate except by an observance of the formalities prescribed by the statute. In the will now to be construed the obliterations, so far from operating as a mere revocation, by destroying the sense of the context, impart to the clause a different and more important significance. Not only does this become apparent, but it is also evident that the construction, which has been contended for, would be productive of the very evils which the Legislature intended to provide against. The obliteration of two or three words might wholly change the character of a devise. As aptly illustrated by learned counsel in argument, if the words were "to my son William I give nothing, and give all my estate to my son John," the will could be made to read, without the insertion of any additional words, "to my son William I give all my estate."

But, as already intimated, this record does not present a question of revocation. It is clear that the testator did not contemplate an intestacy. He evidently intended to make a testamentary disposition of the whole of his property. It was supposed by the learned Judge of the Circuit Court that he intended by the obliterations to diminish the fee simple estates of Leo and John E. Eschbach to life estates. If such was his purpose he has attempted to make another and a different devise of one-fifth of his whole property. He transfers the legal title,

vested in Leo and John E. Eschbach, to trustees, and carves out of the fee simple equitable life estates with remainders to the children of the life tenants. This is a new will as respects the disposition of the one-fifth of his property. Let it be supposed, by way of illustration, that the entire estate had been devised to Leo in fee simple. How could the testator subsequently vest the legal title in trustees, and create an equitable life estate with remainders? Not certainly by obliterations and interlineations, without attestation or the observance of any of the formalities prescribed by the statute. And is a testamentary disposition of the one-fifth of an estate governed by a different principle? The intention of a testator is only to be regarded when the law sanctions the means which he has adopted to carry it into effect. If what he has done is invalid the intent cannot be respected.

In the formation of a judicial opinion the calm investigating faculty of reason should exercise a paramount control; but, in an effort to ascertain, by an inspection of this mutilated will, the real intention of the testator, the aid of imagination seems to become necessary. The aged testator declined to seek the advice and assistance of those whose professional learning and experience would have afforded safe guidance, and, relying solely upon his own judgment, failed in the accomplishment of an intent which he has left involved in obscurity.

The true construction of this will is, that the attempted obliterations are inoperative, and that the will must be read just as it was originally written and executed. The renunciation of Leo and John E. Eschbach as executors, and the appointment of the complainants as trustees, by the order of 27th of September, 1881, from which no appeal has been taken, render a construction of the first clause of the will unnecessary. The trustees, appointed in conformity with a provision in the second clause and by a competent Court having jurisdiction of trusts, have the

control over the estate given to the trustees by the will as it was executed. The shares of Leo and John E. Eschbach are exempted from the operations of the trust thus created, and are to be held by them absolutely and in fee simple. The learned Judge of the Circuit Court, having sought to give effect to the supposed intention of the testator to diminish the estates of Leo and John E. Eschbach, his decree is, in this respect, erroneous. But no other error is perceptible in said decree, which must therefore be affirmed in part and reversed in part.

> *Decree affirmed in part,*
> *and reversed in part,*
> *and cause remanded.*

(Decided 26th March, 1884.)

ROBINSON, J., dissented.

ALVEY, C. J., filed the following concurring opinion:

While I concur in the conclusion arrived at by the opinion of the Court in this case, I do not concur in the reasoning upon which that conclusion is based. I shall therefore state briefly my views of the case.

That the testator intended to effect a change in the disposition of his estate by the erasures or obliterations made in his will, cannot admit of a doubt. The only question is, whether such obliterations can be allowed to have the effect of revocation under the statute.

Section 302, of Art. 93 of the Code, was literally transcribed from section 6 of the Statute of Frauds (29 *Car.* II, *c.* 3); and by that section it is declared that "No devise in writing of lands, &c., or *any clause thereof*, shall be revocable otherwise than by some other will or codicil in writing, or other writing declaring the same, or burning, *cancelling*, tearing or *obliterating* the same by the testator himself, or in his presence and by his direction and consent." By the express terms of the statute, therefore, the testator

was at liberty to revoke any devise or *any clause thereof* contained in his will, by simply cancelling or obliterating the same, without the ceremony of republication.   And it is not disputed that the obliterations that appear in the will were made by the testator himself.

The testator left ten children; seven sons and three daughters.   By his will he appointed his two sons, John E. and Leo, his executors and trustees.   He directed that his estate be divided into ten equal parts or shares, and he gave to all his children life estates in their respective shares, with remainders over to their children, except his two sons John E. and Leo, to whom he gave their respective shares absolutely and in fee.   Some time after making the will, the testator, for some reason not apparent, erased or obliterated the names of his sons John and Leo wherever they occurred in the will; and the will in that form was admitted to probate.   According to the rational effect produced by the erasures upon the context of the will, the exception made in favor of his two sons would be revoked, and their fee simple estates reduced to life estates, as in the case of his other children.   The clauses in the will making the exception in favor of his two sons being in their nature separate and distinct, should, if the revocation *pro tanto* were effectual, be regarded as entirely expunged from the will, and none of the terms employed in making the exception should be applied to the sons generally of the testator; for that would plainly contravene the whole scheme of the will, and defeat the manifest intent of the testator.   In other words, the will should be read as if the exception in favor of the two sons had never been incorporated in it.

Now, with respect to the competency of the testator to make revocation of a devise by the simple erasure or obliteration of the name of the devisee, I can entertain no doubt whatever.   Nor can I entertain a doubt of the competency of the testator to revoke *pro tanto* by simply re-

ducing a larger to a smaller estate, when the act of revocation consists simply in erasing or obliterating the name of the devisee, or the terms by which the larger estate is given. But in all such cases we must have regard to the effect of such revocation upon the rights of other persons. who may claim under the will. If the effect of such revocation is to enlarge the estate or interests of other devisees, or to raise new interests or rights under the will, then it is not simply a revocation, but a new devise, which can only be made by re-execution and re-publication of the will. This I take to be well established upon authority.

In the case of *Larkins vs. Larkins*, 3 *B. & Pul.*, 16, a case arising upon the 6th section of the Statute of Frauds, the testator made a devise of land. in due form to three persons as joint tenants in fee, and afterwards struck out the name of one of the devisees, without re-execution and re-publication of the will; and it was held, that the erasure would operate as a revocation of the will *pro tanto.* Lord ALVANLEY, C. J., said: "Whatever this alteration be, it is not an alteration arising from a new gift, but merely from a revocation. If the remaining devisees were to acquire any estate which they had not before, something beyond a mere revocation would be necessary. If therefore the devisees had been tenants in common, upon the erasure of one name the remaining two would take no more than two-thirds of the estate." The same principle was conceded in the case of *Short vs. Smith*, 4 *East*, 419.

Then we have .the recent case of *Swinton vs. Bailey*, 1 *Ex. Div.*, 120, on appeal, and 4 *App. Cas. (H. L.,)* 70, where the question underwent most thorough consideration. In that case, a testator, by his will duly executed and attested, devised realty to his mother, "Elizabeth Eley, her heirs and assigns forever." Some time after the execution of the will, the testator drew his pen through the words "Eley, her heirs and assigns forever," and then wrote the word "Eley" above the words erased.

And on the question whether the obliteration cut down the devise from an estate in fee to an estate for life, as being a revocation of a devise, or of a clause thereof, within section 6 of the Statute of Frauds, it was held, (reversing the judgment of the Exchequer Division,) that such erasure or obliteration was a revocation of a clause of a devise, within the Statute, and that the mother took an estate for life only. The judgment of the Court of the Exchequer Division proceeded upon the ground exclusively that the words erased did not constitute a clause of a devise, within the meaning of the Statute. But the Court of Appeal did not concur in that view, and reversed the judgment. The latter Court held that the word "clause" as employed in the 6th section of the Statute means nothing more than "part," and that the words erased constituted a clause within the section; and the devise being one in fee simple it was divisible into two parts, and that being so, it was competent to the testator who gave the larger estate, to revoke by erasure the gift to the extent of cutting it down to a devise of an estate for life. Cockburn, C. J., in delivering his opinion in the Court of Appeal, said: "Now I quite agree that you cannot by merely striking out words alter a will so as to enlarge the estate of some one who takes under the will, or so as to have the effect of granting a new estate to some one. But when the purpose is simply to revoke and undo something which has been done, and when the effect of striking out certain words is to revoke what has been given, and no more, it does not seem to me to be brought at all within the mischief contemplated by the Act, or to be inconsistent with the terms of the section." The other Judges expressed substantially the same view. The case was taken by appeal to the House of Lords, where the judgment of the Court of Appeal was affirmed without dissent, and for very much the same reasons that had been assigned for the judgment in the Court of Appeal. 4 *App. Cas.,* 70.

Now, taking the principle of the case' just cited to be established, and that the effect of the obliterations in the will in this case would be to reduce the estates given to the two sons from fee simple to life estates, the question is, will such revocation, if allowed, have the further effect to give new estates to other persons, or to enlarge the estates of other devisees in the will? As we have seen, the devises to the two sons being of fee simple estates, the revocation of those devises, and the treating the exceptions in favor of those two sons as if they had never been incorporated into the will, place those two sons in the class with all the other children, who take but life estates, with remainders to their children, and in default of children or descendants, over to other devisees under the will. Such revocation, therefore, if allowed to have effect, would not only cut down the greater to less estates, so far as the two sons are concerned, but would have the further effect to give new estates to other parties, or to enlarge the estates of other devisees; and that being the case, the attempted revocation *pro tanto* cannot be allowed to take effect. The will must therefore be read as if the obliterations had never been made. And consequently, John E. and Leo take absolute estates in fee under their father's will.

Judges Miller and Irving authorize me to say that they concur in these views.